Good morning, Justices. William Pabarchus appearing as counsel for... Why don't you wait till you get up to the microphone. Actually, we can hear you very well from there, but... You have to think of your public out there. You are being streamed worldwide. If you weren't nervous enough, there we go. Oh, I don't know about that. William Pabarchus appearing for the appellant... But it would be helpful if you stood between the two mics. Will do. And Ms. Alatorre is present in the courtroom, the lady in the yellow sweater. And I would like to begin my argument, if I may, by suggesting to the court that one of my goals here today is to dissuade the court from accepting the conclusion of the trial court that this case is no more than an office romance gone bad. It's far more than that. As the record clearly demonstrates, that is, the undisputed material facts show, that when Ms. Alatorre was hired in her position as a skilled rider at Camp Pendleton as a civilian employee, for a period of time thereafter, Mr. Bergamini pursued her. She rejected his pursuit for a period of time. She became vested in her job. She enjoyed it. She needed the work. And she feared that she would be fired because Bergamini was a supervisor in her division who could exercise power over her. She eventually relented, and they began a relationship. She chose to terminate that relationship. In the time that followed, it's quite clear that a pattern of harassment and discrimination ensued, not only by Bergamini but others within her office. At what point does the employer, the Navy, get charged with knowledge of this? I think certainly when Ms. Alatorre... I mean, I think we're agreed, right? Bergamini is an individual, and so long as what he's doing is just between the two of them, an employer doesn't know, doesn't have any reason to know, it wouldn't be anything to charge the employer with, right? I would certainly agree with that, Your Honor, yes. But there comes a point, as part of your case, that the employer, here the Navy, gets charged with this knowledge, and I just want you to focus on when that happens. I think certainly at the point when Ms. Alatorre complained to her immediate supervisors about the conduct of Bergamini and others in the office. Why was it reasonable for her to complain to her immediate supervisor, who was I think lower in the pecking order than Bergamini? Did you say lower than? Right. Well, pursuant to the Navy policy that was in effect, the initial authorized level of complaint was to supervisors, and she went to Mr. Hunt, who was the supervisor above Bergamini in that department. Mr. Hunt, if he investigated at all, it was virtually nothing. That then led to her complaints going up to the next level to Colonel Kersey, and it was at that juncture that Colonel Kersey, again, either very sparingly investigated or came to the conclusion that the only way he could salvage her participation in the office was to physically remove her, which he did, and she began working in another building performing the same work. So throughout that time when Ms. Alatorre is complaining to her superiors of the harassment and discrimination that was being undertaken by a number of employees, and we have to bear in mind, and I'm not going to repeat them in open court, but we're dealing with a number of incidents where expletives were tossed at her, where a dead mouse was wrapped in a candy wrapper, where there were and also the explicit e-mails. So, Counsel, I don't want to go through it because I don't want to have all of your time tick away, but isn't it correct? Your client has described that chain of command differently in the record. Are you aware of that or are you taking the position today that when she complained to her supervisor, she complained to somebody who supervised Bergamini before Kersey? That's my understanding, that Hunt was at a level above Bergamini. Okay. Bergamini working in the same office. Okay. In any case, then there's a January. I have the same misapprehension. I thought that he was below Bergamini, that he was your client's Ms. Alatorre supervisor, but that he was below Bergamini. Well, if I have a misapprehension, I apologize. The record is the record. I think the critical juncture, though, is that when that complaint was made to Hunt, even assuming he was below Bergamini and no action was taken, she then clearly went to the specific supervisor for the entire department, which was Colonel Kersey. In January of 2012, I think. Correct. So he responded the next month by transferring her, moving her to public works. To a different building to perform the same work that she had been doing, correct. So is there a problem with that, with that response? Certainly there is because the law is quite clear that the employer, here the government, had a duty to investigate, to take action, to remediate any ongoing discrimination and to deal with what had occurred in the past. Peter Kersey did not. Why shouldn't we interpret his response as a means to completely protect her and allow her to continue with her duties? Certainly on a human level I would agree. I think the law, though, is slightly different in that the government, the Navy, had a policy.  We, your employer, must investigate it. We must take action to remediate what occurred in the past, prevent it from happening in the future. Here Colonel Kersey simply extricated Ms. Alettori from her work environment and put her in another building. Now, again, on a human level, I think that eased her. She wasn't exposed to this periodic, near constant harassment, and she was effectively able to get her work done. As the record reflects, Colonel Kersey said she was a highly valued employee. She was good at her job. Then what happens? When Colonel Kersey retires, a joint decision is made between Hunt, Hill, and Bergamini to move her back to the site where she was being discriminated and harassed. I've looked for, can you give me a citation to the record where Mr. Bergamini participated in that decision to move her back to facilities maintenance? I believe I can, Your Honor, if I can have just a moment. If you want to do that on rebuttal, that's fine. I don't want to take all your time. I know I have it in my notes, Your Honor, but momentarily I'm unable to find it. I'm sorry. That's all right. But I do recall clearly, I believe it was a deposition of Mr. Hunt in which he said it was a decision of all three, meaning Hunt, Hill, and Bergamini. So the government's position is that there was a cooling off period. They brought her back. They had an all-hands meeting where everybody was, other employees were told, we have to act professionally and whatnot. And another thing I've looked for is to see whether your client objected when she was transferred back to facilities maintenance. To be quite honest, I don't recall seeing in the record a specific objection by Ms. Alatore, but I think that she was powerless. At that point, she had had that, as you characterized it, a cooling off period. Perhaps she thought that the situation had been toned down enough where she'd be able to function well. It's hard to say. I think I should have asked a better question. Here's my question. Is it your position that the transfer to public works was a tangible employment action? I believe that it was on a pragmatic level for this reason. Number one, while she was able to, by public works you mean the transfer back or initially? Just take them one at a time, if you would. The first transfer, where I characterized it as perhaps they were trying to protect her by moving her to public works, your position is that that was an adverse employment action, tangible employment action? I would argue that it was for this reason. While there were people in the workplace who certainly harassed and discriminated against her, there were others that weren't. By being transferred into a separate environment, she was not able to have the socialization that she had with others in the office with whom she enjoyed the work, and also there is certain pragmatic problems in her doing the work and interfacing with Colonel Kersey. Okay. Because he was here, she was there. Your time is ticking. Is it your position that when they moved her back, that was a tangible employment action? It certainly resulted in it for several reasons, the most important being that once she was moved back, she was deprived of her ability to work. She was ordered to take online courses. I don't think so. The record I have is that the online courses started in September. She moved back in May. Yes. When she first moved back, she was working. Right. Between May and September. Correct. And then she was ordered not to do any work, take online courses, and I think she took 310 online courses. But those didn't happen at the same time. I'm just trying to be clear. Those didn't, that moved back to? It wasn't simultaneous, correct. Okay. All right. Thank you. And certainly her inability to get work done affects her performance, reviews and levels, her sense of self-worth, doing productive work for the government, the employer for whom she was hired, and is adverse under all of the, certainly in the Ninth Circuit, instruction in that regard and all the cases that we've cited. Just one more question. Certainly. Who ordered her to take the online courses? Is there any evidence that Mr. Bergamini had a role in that? I don't recall he having a role. It's my recollection it was either Hunt or Hill. Thank you. But I don't want to misstate the record. That's my recollection. May I ask you a question? If a supervisor harasses an employee, do you object to the remedy of moving the employee so that she won't be in touch with the supervisor? Do you object to that as opposed to moving the supervisor? Do you think it's a requirement to move the supervisor out of the unit rather than the employee? I rely on the policy that was in effect through the Navy. That policy required a vigorous investigation and the Navy to take affirmative action to remedy what occurred in the past and to prevent it from occurring in the future. Putting those two elements together, that tells me that the... Well, let me try the question again. I was getting to it, Your Honor, if I may. Because putting those two elements together tells me that if the abuser is the supervisor and the investigation finds that and there was a thorough investigation, it is that supervisor who should be moved rather than the employee who has been abused. Now, again, I think Colonel Kersey was trying to do something to help Ms. Alatorre. No, I understand that Colonel Kersey was well-motivated. I have no question about that. I just say if there's a situation created by a supervisor where the two people can't stay in the unit, does the law require that the supervisor be moved out of the unit rather than the victim be moved out of the unit? If the employer has concluded that that supervisor has been guilty of sexual discrimination and harassment, in my view, that supervisor should be out of there. Counsel, in the January 2012 meeting, my understanding is that your client complained to, I don't know the rank of Kersey, is it... Colonel. Colonel Kersey, thank you, about Bergamini and also Hill and also Monroe. Is that right or have I got my meetings wrong? You said January 2012? Right, it's the first meeting with Colonel Kersey. My notes reflect that she met with Kersey and Hunt to discuss harassment and that she told them she did not want to file an EEO complaint, even though both Kersey and Hunt felt, based on what she demonstrated, that harassment and discrimination had been occurring. Who was she complaining about? She was complaining about the totality of the people in the workplace. No doubt Bergamini was a primary figure. As was Hill and Monroe at that point, I think. Is that right? Yes, certainly Monroe was and Hill as well. That's correct. She doesn't really have a basis for an EEO complaint at the point she first complains about the conduct, right? About who? About the conduct. She has to bring it to the employer's attention in order for there to be the basis for an EEO complaint. Oh, certainly, yes. Yes, I would agree with that. The employer has to have some notice. Right, but it's the other way around, too. She has no obligation to go to the EEO because the first step is to advise the employer, right? I would agree, yes. Is the first meeting in March of 2011, meeting with Bergamini, Alettori, and Hunt, complaining about coworkers? But Bergamini was there at that meeting. I don't think she was complaining about Bergamini in March of 2011. That was more about the coworkers. Yes? Yes, Your Honor, I fully agree. My notes reflect Ms. Hill's conduct and others'. Okay, thank you. I'm certainly happy to get into some of the legal aspects of the case, but, again, this is one that is factually controlled, and we believe that the facts demonstrate, based on undisputed evidence before the trial court, that there was both, actually three, discrimination, harassment, and then subsequent retaliation. With that, I'll withdraw, and the government will argue. Good morning, Your Honors. May it please the Court. My name is Dan Butcher, and I represent the Department of the Navy. I'd like to start by first clarifying that Mr. Hunt was subordinate to Mr. Bergamini in the chain of command. He reported directly to Mr. Bergamini. He was Ms. Alatore's second-level supervisor. Mr. Bergamini was her third-level supervisor. Why does that matter? Because Mr. Hunt, as he stated in his reply declaration, has no power to take disciplinary action against Mr. Bergamini. So if Ms. Alatore reasonably would make a complaint that could affect Bergamini and help the behavior stop that she's objecting to, she would need to go to Lieutenant Colonel Kersey, who was the head of the department. And why isn't that up to Mr. Hunt? He is her supervisor. He is part of the management. She informs the person that she feels most comfortable talking to, which would be her supervisor, which seems natural rather than going to somebody two steps up the chain. And why doesn't Mr. Hunt at that point, even if he can't take disciplinary action against Bergamini, why doesn't he then have a managerial responsibility to inform whoever else up the chain of command is needed to take corrective action? So under the Department of the Navy's sexual harassment policy, he would have an obligation to report that if he understood it to be a complaint about sexual harassment. Ms. Alatore never made a complaint to Mr. Hunt about Mr. Bergamini. Excuse me. Before you go farther, forgive me for interrupting. He would have a duty to report it where? To the EEO office or up to Kersey or where? I would say both. Under the policy, he would have to go both. Okay. I've interrupted you. Forgive me. Go ahead. Yes. So I'm sorry. Then your first argument that she talked to the wrong person is just really beside the point. You're making a different argument, and that is she made the wrong kind of complaint. Well, I think both. I think, first of all, with respect to her. Well, no. It can't be both. If she had made the right kind of complaint, then you agree. I mean, you say it's the wrong kind of complaint, that Hunt would have been the right person to go to. He would have complained about sexual harassment by Bergamini, and Hunt had received that complaint. Then, yes, Hunt would have had an obligation to take that to another level. Okay.  So what did she, in fact, complain about, in your view, to Hunt? You're not complaining that she went to Hunt. Pardon me? You're not complaining about the fact that she went to Hunt. No, she could. Certainly, she was entitled to go to Mr. Hunt with a complaint. It's not what you said a few minutes ago, but okay. So what is it that, in your view, she complained to Hunt about? So she went to Hunt and complained about things being moved in her office, about pictures being crooked, about miscellaneous office supplies missing, about files being rearranged, about Mr. Monroe showing her a mouse, things of that nature. Nothing to do with Mr. Bergamini. A dead mouse in a candy wrapper, right? A dead mouse in a candy wrapper. And there are two versions to that story. For purposes of summary judgment on this appeal, we'll accept plaintiff's version. I think we're obligated to do that. Yes, absolutely. Mr. Monroe has a different version to the story, but that's neither here nor there. So Mr. Hunt received those complaints. He did not perceive them as complaints of sexual harassment, but he took corrective action. Well, my notes show that in March, with the meeting that included Monroe and Bergamini and Hunt, she was complaining at that point that coworkers were making false allegations that she was having affairs with others. Correct. That was one of the allegations. Okay. And then in January, where they're meeting with Colonel Kersey, it sounds like she's ‑‑ I think the notes were that she's complaining of a hostile work environment. She was afraid of Hill, that he had slammed the door and yelled at her. Okay. Yes. And also said that Bergamini was harassing her. Do we know what the nature of that harassment was, or where do I find the notes of that meeting? I don't see anything in the record, Your Honor, that indicates that she complained at that meeting that Bergamini was harassing her. But let's assume for argumentative purposes that she did say that. That was in January of 2012. Right. Mr. Bergamini, according to plaintiffs, started harassing her in August of 2009. That's not a reasonable action, saving action on the part of plaintiffs. The first time she complained to anyone about Mr. Bergamini was more than two years later. And then she wants to recover hundreds of thousands of dollars in damages for more than two years. And November 2009, didn't she ask Hunt to keep Bergamini out of her office? So that was on November of 2009, Your Honor. And what the record reflects, again, Mr. Hunt denies this, but for purposes of summary judgment we will accept plaintiff's version. The citation is page 246 of the excerpts of record. And that's an excerpt from plaintiff's personal diary where she made a handwritten notation. And what she says is, I asked Jeff, meaning Mr. Hunt, to keep Jay out of my office so I could get work done. That's the extent of it. And that's not a complaint about sexual harassment. Well, why did he think she asked to keep him out of the office? You mean because he was just coming to her office for no reason and sitting there the whole time? You don't think there was somebody in that discussion would have asked, why is he in your office? Why do you object? I understand Your Honor's question. I don't think the reasonable inference of that in light of this whole case is that she wanted him out of the office because, you know, he's a supervisor. Why is a supervisor coming to a woman's office with whom he has had relationships in the past and now comes and bothers her in her office? Wouldn't you think that would suggest that there was some sexual aspect to it? Not at all, Your Honor. I don't think that's a supportable inference under the facts here. At that time, Mr. Bergamini, although he was Ms. Salatori's third-level supervisor, he was directly supervising her on what she was working on, writing the standard operating procedures. That's number one. So he had reason to be in her office. And what was the reason to say, I would like you to keep him out of my office? Why would you say that if it were a normal supervisor coming to your office for normal reasons? Well, it may be a number of reasons. She was coming too frequently, she was getting distracted, and she wasn't able to complete the work that she wanted to. But it's a long way from that point, Your Honor, to sexual harassment. Well, it seems to me in the context of this case that for her to complain to another supervisor that here's the supervisor, he's coming to my office too often, don't you think in that discussion it would have come up why? What's wrong with your supervisor coming to your office? I can't imagine what else he was complaining about, about this supervisor coming to her office. Keep him out of my office? There had to be a reason for it. They must have discussed what reason. Well, Mr. Hunt was there on site. I'm sure he could observe as well Mr. Bergamini spending time around plaintiff in her office. And keep in mind at this point, even though the dating relationship had not yet started, that was not later until July of 2011, there was still a consensual after-hours friendship at that point between Mr. Bergamini and Ms. Salatori. And Ms. Salatori admitted that she was a co-initiator of this relationship. She would invite him to go on walks, invite him after-hours to dinner and the like. So clearly that was well known, I believe, to everyone in the facilities maintenance division that they had this social after-hours relationship. They were friends. They went on walks together. But there was no reason from that to Mr. Hunt to conclude or even suspect that Ms. Salatori was being stalked or sexually harassed if there was any quid pro quo demands for sexual favors in exchange for any employment action or anything of that nature. It's just simply not supported by the record, Your Honor. There wasn't anything. You read Ms. Salatori's complaint that she filed in this case and compare it to what the complaints were along the way. So when in the government's, in your view, did she in fact complain about sexual harassment? May 31st, 2012, when she first went to the EEO office. So the complaint to Colonel Kersey doesn't count? It does not. It falls far short of conduct that this court has held is insufficient to constitute sexual harassment. I would refer the court to the Westendorf opinion, which is 7-12. What did she tell Kersey? She told Kersey, we've gone through it, someone showed me a mouse, there were rumors of affairs going around. No, I thought that was Hunt. Hunt and Kersey in January 2012. Hunt and Kersey in January 2012. And many of the complaints that she made to Bergamini and Hunt back in March of 2011, I believe it was, she repeated again in January of 2012. And that's when they said, okay, enough's enough. She had complaints against literally I think everybody she was working with. So at that point they said, enough's enough. We'll move you to a safer work environment where you don't have to endure this. And that was the remedial action that she's taken. And once an employer gets notice of sexual harassment, the employer has an opportunity to remediate it. And it's only the failure to remediate that can cause the employer to be liable in damages. And I would say two things. First of all, that complaint under this court's decisions was not about sexual harassment. It falls far south of a severe or pervasive hostile work environment that's permeated with intimidation and ridicule, as the court had quoted. But let's assume for argumentative purposes that that was about sexual harassment. The remedy was appropriate to move her away from those harassing coworkers to the public works department. Who made the decision to move her back? So that was Mr. Hunt's ultimate decision. And I know the court asked some questions about Mr. Bergamini's role. And the evidence in the record is that it was a collaborative management decision. So he had input? Bergamini had input? Mr. Bergamini did have input. Okay. Did your client object to being moved back to facilities maintenance? Sorry, sorry. Forgive me, forgive me. Did the plaintiff complain or object to being moved back? No, Mr. Hunt stated in his declarations that this was a, in his deposition, this was a mutual decision between him. Yeah, that's your team. But is there a conflict in the record about that? Did she deny that? All Ms. Salatori stated that's in the record with respect to her perspective is that Mr. Hunt instructed her to do that. But she doesn't deny that she was willing to do it. And let me go on, if I may, with respect to that. So she was moved back in roughly mid-May of 2012. Uh-huh. Soon, shortly thereafter, she received those e-mails from Mr. Grant. The cartoons and whatnot. Exactly. Uh-huh. And then she went to, and Mr. Hunt, by the way, had a meeting where he stated that no harassment would be tolerated. It didn't work out. So two weeks later, she felt that she was being harassed again, and that's when she went to EEO. And they said, okay, fine, moved her back again to public works because it didn't work. Well, she actually first went to Hunt and said, aren't you following up? And that's when he said something about you need to get a thicker skin. Right. She did try to go up the chain of command again and felt rebuffed, I think. That's my word. And then she filed, right? That's correct. That was Mr. Hill, not Mr. Hunt. But your image is right. Okay. So she has that interim attempt to use the chain of command again. Doesn't get anywhere. And then? Two days later, I believe, she went to EEO, which was the appropriate thing for her to do if she wanted to make a complaint about sexual harassment. But I would still emphasize that not in March of 2011, not in January of 2012, not even with respect to Mr. Hill, two days before she went to EEO, did she complain about Mr. Bergamini harassing her. That never happened until she went to EEO. That was the first time. And that was more than two and a half years after she claims that this harassment by Mr. Bergamini began. And all along the way, there was no reason for anyone in the Navy to believe that there was anything untoward going on. And, in fact, as plaintiff has acknowledged, it was a consensual relationship. So the Navy didn't have any right, let alone duty, to interfere with that. And she was, and I think a lot of the, to the extent that she was having tension with her coworkers, the source of that tension was because they perceived that Ms. Alatore was getting favorable treatment because of her relationship with Mr. Bergamini. She had her own office. She was getting a special assignment. She wasn't having to do the job that she was supposed to be doing. And that created an additional work burden on the others who had to pick up that slack. Plaintiff has made other allegations in the past of a similar nature, I think. Correct. Three other times? I believe this is her fifth time. Four other times? Does that fairly play any role in our analysis here, that she's familiar with the process of making an employment-related claim of harassment? So, and this gets back to the point that we discussed earlier, whether she had any confusion about the Navy's EEO policy that allowed her to go to her supervisor. She hasn't claimed any such confusion. In fact, along the way, she was thinking out loud, well, maybe I may go to EEO. She said that, I believe, in March of 2011 and then discussed it with Colonel Kersey and Mr. Hunt in January of 2012. So it demonstrates that she wasn't suffering from any confusion about how to get to EEO and what she needed to do in order to make a sexual harassment claim and start a sexual harassment investigation. Well, it sounds like there isn't confusion about her knowing that that option is available. But if a person, just a hypothetical person, is trying to keep her job and advance her career and get along with coworkers, there's a lot to balance, a lot of balls in there. And it's hard to know, especially with 20 hindsight, when the switch should have been flipped. I don't mean to second-guess, but I'm trying to figure out, as a legal matter, what your position is about whether the earlier complaints really fairly play any role in our analysis here. I don't think they play a major role or a role at all with respect to the issues that we've been discussing. However, I think it became relevant to the extent that Plaintiff was going to argue that she didn't know about her EEO remedies and how to file a proper EEO complaint demonstrates that she does because she's done it before. She's familiar with that sort of system. When you say the Navy has a policy, and you've talked a little bit about the policy today, and these were other complaints were at other facilities, is it the same Navy policy throughout the system, or are they different sort of base by base? I don't know. Well, there's one general overriding Navy policy that governs sexual harassment throughout the branch. So your position is she would have had familiarity with the process because she's been through the same process? Exactly. Okay. Yes. All right. One final point, if I like. The Supreme Court in Ellerth and Farragher made very clear that the primary purpose of Title VII is prevention and remediation. It's not redress and damages. Here the Navy upheld its end of that bargain through its EEO office, its EEO program. Plaintiff did not hold up her end of the bargain by availing herself of those remedies and giving the Navy the opportunity to redress the sexual harassment, especially the sexual harassment by Mr. Bergamini. Thank you, Your Honors. Thank you. One central brief comment, if I may. I think some of the questions by the justices indicates what's involved here, and that is we're appealing the grant of summary judgment by the ultimate dismissal. The court has asked a number of questions about what inferences can be drawn from the evidence that was presented before the trial court. As we know, all reasonable inferences are to be construed in favor of the plaintiff at the trial court level. While there may be conflicts in the evidence, those conflicts create genuine issues of material fact that we respectfully submit should go to a jury. What in your view was, did she make her first sexual harassment complaint? That would have been to, excuse me. That would have been in March of 2011, per my notes from the record, Your Honor. That's when she complained to Hunt and Bergamini regarding Mr. Hill's conduct and that of others involving purported affairs with other coworkers and the like. I'm sorry. This was a complaint that others were saying about her that she's having affairs with coworkers. That's correct. No complaint about Bergamini. That's correct. Okay. In that one. And you think that's a sexual harassment complaint? No, but I think it goes back to... Let me then restate the question. When is the first time that she made a sexual harassment complaint to her employer? What I'm having a problem with, Your Honor, is this. If a male worker uses a position of power to demean a female employee, is that sexual harassment? And yet that's what had been going on at least from August of 2010 up to March of 2011. I have to keep in mind Bergamini stormed into her office in August of 2010. If you don't want to answer my question, you don't have to. As to the date? I didn't ask you what was happening. I was asking when is the first time that your client complained about sexual harassment to her employer? I would say... When was that and what was the incident? March of 2011, in my view, Your Honor. And that was... Tell me a little bit more about that complaint. And that was a meeting with Hunt and Bergamini in which she complained of Mr. Hills and other supervisors' conduct. And what was that conduct? Mr. Hill had stormed into her office, slammed the door on leaving, threatened her, and then the allegation by other co-workers that she was having affairs with multiple employees. I'm sorry. There was something sexual about... There was sexual harassment in Mr. Hill walking in, slamming the door? Maybe I'm my own chauvinist, Your Honor, but when a man storms into a woman's office and starts yelling at her using the power of the male gender, to me that's a form of harassment. Sexual harassment? To me it is, yes, certainly. Okay, I just wanted to know what your position is. So let me then ask a separate question. When is the first time that your client complained about Bergamini engaging in sexual harassment? In January of 2012, per my notes. Okay, and that was what meeting? That was a meeting with Kersey and Hunt in which she discussed historically what had occurred in the office. Some of the things that we've already talked about. And that was when she was moved? Shortly after that she was moved. It was a result of that meeting? I believe so, yes. She was moved in February of 2012. So the meeting occurs in early January. I guess they're trying to figure out, that is Colonel Kersey primarily, how to address the situation, and then in February she's moved to the other building. Is there any record of her having objected to moving? Saying, no, I'm going to stay here and move to the other building? I am aware of no objection, assuming that she could. I see the voice of objection, but I don't think so. I asked you whether there was anything on the record. I don't believe there is, Your Honor.  I thank you all for your time. Thank you, counsel. The case, as urged, will be submitted.
judges: Reinhardt, Kozinski, Christen